Lucien **SHERROD**, Individually and as Administrator of the Estate of Ronald Sherrod, deceased, Plaintiff,

v.

Willie **BERRY**, Frederick Breen and the City of Joliet, a municipal corporation, Defendants.

No. 80 C 4117.

United States District Court, N.D. Illinois, E.D.

Nov. 15, 1985.

---

See also, 589 F.Supp. 433.

Andrew J. Horwitz & Assoc., Chicago, Ill., Douglas Rallo, Lake Forest, Ill., for plaintiff.

A—William W. Kurnik, William C. Barasha, Kurnik & Cipolla, Arlington Heights, Ill., for defendants.

## Memorandum

LEIGHTON, District Judge.

This civil rights suit was brought by a father to recover for the death of his son who was shot and killed by a City of Joliet police officer. A jury returned verdicts and defendants have filed post-trial motions. One of the issues raised is whether this court erred in admitting evidence which allowed the jury to consider "the hedonic value of a human life" when it decided the damages to be awarded plaintiff for the wrongful death of his son.

An expert in economics was permitted to testify that in determining the value of a human life in such a case, a factor to be considered is the hedonic value which, according to qualified economists, is worth more than the economic value of that person. The jury awarded the father $450,000 for the loss of parental companionship with his son, $300,000 for economic loss to the estate, $1,700 for funeral expenses, and $850,000 for the value of the son's life. Defendants contend they were prejudiced by the testimony of the expert and that consequently, they are entitled either to a judgment notwithstanding the verdict, a remittitur, or a new trial. This court does not agree. When a jury is shown that a person was wrongfully killed, and it is asked to award damages, evidence, including the testimony of an expert, is admissible to enable the jury to consider the hedonic value of the life thus taken.

I

On December 8, 1979, Ronald Sherrod was 19 years old. He lived in Joliet, Illinois, with his father, Lucien, and worked as a mechanic in a family-owned auto repair shop that did business as Sherrod's Auto Repair. He had an older brother, Tyrone, who also worked in the auto shop. Ronald had gone as far as the senior year at Joliet Central High School. He was not known to the police; he had never been arrested for, or charged with, a crime.

The Sherrods are Negroes. When Ronald was 12 years old, his mother died; and his father married his present wife, Sandra, a Caucasian woman. She, as a stepmother, took over the task of rearing Ronald and guiding him through school. Whenever she spoke of him, as she did in her testimony in this case, she called him "my son." Ronald was close to his father and to other members of his family; they all considered him a kind, loving, and companionable youth who enjoyed life.

Lucien Sherrod had plans for his future which involved Ronald and his brother, Tyrone. In August 1979, he spoke about their taking over the family garage business and running it. They informally agreed that Tyrone and Ronald would remain in Joliet, work in the garage, take care of expenses from gross income, and pay their father 50 percent of the net profits for his interest in the auto shop property and business. It was agreed that the turnover would take place early the next year, January 1980, and that Lucien, Sandra, and the younger members of the family would move to Savanna, Illinois, a rural community northwest of Joliet where the Sherrods owned a home. As a boy growing up, Ronald had been there with his father on hunting and fishing trips.

December 8, 1979 was a Saturday; the weather was clear and cold, it was typical of a day early in the oncoming Christmas shopping season in Joliet. That afternoon, shortly after 3:00 p.m., Ronald was working on a car, doing "a tune-up" with a part-time mechanic, Chuck Doran. Also at work were Tyrone and another employee, O.J. Smith. At about 3:17 p.m., a distance away from the Sherrod body shop, and unknown to anyone there, Jim Youngquist and his wife, Janet were in the basement area of their plants and gift shop called "Ziggy's." They heard a noise that sounded like some coins dropping on the floor from the cash register and heard footsteps along with the doorbell ringing.

Janet Youngquist ran upstairs. As she did, she saw a man dash out of the shop, and noticed that the cash register had been rifled: between $50 and $80 had been taken. She followed the man; he became excited, dropping to the ground the money he had taken from the cash register. A woman next door called the police, and at about a minute after 3:17 p.m., they sent out a radio alarm reporting that "some kind of robbery" had occurred at Ziggy's. The man Janet Youngquist saw was Gary Duckworth who was well known to Joliet police, but who had never been known to commit a violent crime. Janet Youngquist saw him run toward a car parked not far away; but he continued on, out of her sight.

At about 3:40 p.m., Duckworth entered the Sherrod Auto Repair Shop while Ronald Sherrod was still working on the tune-up. He asked Ronald and Chuck Doran if one of them would help him start his car which he said was parked some distance away. Ronald asked Doran to take over the tune-up job; he agreed to drive Duckworth to get his car started. Ronald and Duckworth entered a black Cadillac sedan which Lucien Sherrod had purchased for his son sometime before, second hand. The two left the auto shop.

When the first radio alarm went out reporting that there had been "some kind of robbery at Ziggy's," Joliet police officer Willie Berry was having a late lunch at a friend's home. He heard the transmittal through a radio unit he carried. Berry was on a patrol assignment, driving a police Scout; with him was a rookie policeman, Richard Klepfer. Shortly after 3:30 p.m., Berry and Klepfer resumed their patrol duties; as they did, there was another police transmission which described the man who had entered Ziggy's earlier and rifled the cash register; it stated that the police believed his name was James Lee. However, Berry told Klepfer that, in his opinion, the description was of Gary Duckworth whom he knew. He went on to suggest that they join the investigation of the crime at Ziggy's.

Berry then drove the Scout past Ziggy's; but when he saw nothing of significance, he proceeded onto Waverly Avenue in the 900 block. The street was in "a part business part residential white area." As Berry proceeded, he saw a black Cadillac sedan, the car driven by Ronald Sherrod with Gary Duckworth, as a passenger. Because of the area, it being "a white neighborhood," Berry became suspicious of the vehicle. He saw it slowly leave a parking lot next to a bank that was closed, as it was late Saturday afternoon. The car was not speeding; it was not engaged in any evasive maneuver; nor was anyone in it committing any act that was either unlawful, illegal, or threatening to anyone.

When the Cadillac was about 100 feet from the Scout, Berry recognized Duckworth; he told Klepfer to "watch that car." Then, as the Cadillac neared, he signaled the driver to stop. Berry drew out his Smith and Wesson city-issued revolver; Klepfer drew his; and the two police officers approached the vehicle. Berry, using street vulgarities and profanities, shouted to the occupants of the car, "Get your hands up! Get your M_____ F_____ hands up!" The two men complied; Berry then approached the driver from the left side of the vehicle, holding his pistol pointed at Ronald Sherrod's left temple. Berry said later, and has testified, that as he looked, he saw Ronald Sherrod raise his right hand

and moved it toward the left pocket of his jacket. At that, Berry pulled the trigger of his pistol, shooting Ronald Sherrod in the left temple, killing him instantly. When his body was examined by Berry, Klepfer, and other Joliet police officers, Ronald Sherrod had a cigarette lighter in the left pocket of his jacket; in the right-hand pocket was his driver's license. No weapon of any kind was found either in or near the car, or on Duckworth. The news report of the killing stated that the police suspected Ronald of being a robber. A coroner's death certificate that was issued later recorded that Ronald Sherrod was suspected by the police of having been a robber. There was no factual basis for these suspicions.

Because of this fact, Sandra Sherrod, accompanied by a friend of long standing, went to the office of Frederick Breen, the Joliet Chief of Police, asking that "the name of my son be cleared" by removing the insinuation that Ronald Sherrod was suspected by the police of having been a robber, and that disciplinary action be taken against Berry. Her request was refused; she went to Breen's office a number of times later, always with the same friend, and always insisting that "the name of my son" be cleared by Breen in his capacity as Chief of Police of Joliet.

Berry, at the time of this incident, had been a Joliet policeman a little more than six years. Breen knew him; he had evaluated Berry as an average or above average police officer. Breen had been Joliet's police chief for thirteen years. Sandra Sherrod's complaint was not the first time a citizen had complained to Breen about Berry using excessive force in the discharge of his official duties. In fact, on at least three earlier occasions, a citizen had been abused by Berry. In none of the incidents did Breen impose serious sanctions on Berry. This suit was filed by Lucien Sherrod, individually, and in his capacity as administrator of the estate of his son, after he and his wife, Sandra, could not obtain the redress they sought from Breen and the City of Joliet.

## II

At the trial, in order to prove the damages he suffered from the death of his son, Lucien Sherrod called as an expert witness, Stanley Smith, an economist, holder of a master's degree in economics from the University of Chicago. Defendants did not question Smith's qualifications; instead, they filed a motion *in limine* asking that his testimony concerning the hedonic value of life be excluded from the jury on the ground that it was speculative. The motion was denied, this court ruling that such testimony was not speculative; that it was relevant and material and would aid the jury in determining the proper amount of damages in the event it found in favor of the plaintiff.

Accordingly, Smith, after explaining what he did and the information he used, testified to the amount of loss Lucien Sherrod suffered when he was deprived of his son's association and companionship. Smith described and explained how he had calculated the economic loss which Ronald Sherrod's estate incurred from his death. Smith told the jury the basis of his opinions, and the economic theories which supported his conclusions.

Apart from his testimony concerning the economic value of life, he gave the jury some "insight into the guidelines that economists use in looking at how society values what we call the hedonic aspect, the hedonic value of life, separate from economic productive value of an individual." He said there had been studies by economists which "indicate that a human life has value separate from the economic productive value that a human being would have." Of course, Smith said, the economic aspect of life valuation presents what may appear to be imponderable difficulties in those cases when the individual, because of infancy, old age, or physical incapacity, has no measurable economic productivity. These difficulties, however, did not apply to the case before the jury because Ronald Sherrod was gainfully employed up to the day he was killed by Berry.

Smith told the jury that in the last 10 years economic literature showed some 15 studies "with respect to the value of life." There "was a study by Blomquist here in Illinois" which in turn considered all the other studies and found that there was a relationship somewhere in the dimension of three times up to 30 times their economic productive income. Smith expressed agreement with Blomquist's conclusions, considering him an authoritative source of knowledge on the subject of the hedonic value of life. At the end of Smith's testimony, which included extensive direct and intensive cross-examination, this court asked Smith to define for the jury the word "hedonic" as it is used in the expression "the hedonic value of life." Smith said:

It derives from the word pleasing or pleasure. I believe it is a Greek word. It is distinct from the word economic. So it refers to the larger value of life, the life at the pleasure of society, if you will, the life—the value including economic, including moral, including philosophical, including all the value with which you might hold life, is the meaning of the expression "hedonic value".

### III

This testimony was given to the jury that was considering the claims which Lucien Sherrod was asserting under 42 U.S.C. § 1983 as administrator of his son's estate. A § 1983 action is a suit for tort damages, even though the duty a defendant is alleged to have breached is created by the Constitution or federal law. *Benson v. Cady,* 761 F.2d 335, 339 (7th Cir.1985). This section was enacted by Congress to protect individuals against invasions of federally guaranteed rights through the misuse or abuse of powers derived from the state, *Luker v. Nelson,* 341 F.Supp. 111, 120 (N.D.Ill.1972); and to furnish a damages remedy, where proof is made, to those whose civil rights are violated but who cannot get relief in the courts or agencies of their state. *Monroe v. Pape,* 365 U.S. 167, 180, 81 S.Ct. 473, 480, 5 L.Ed.2d 492 (1961). The basic purpose of a § 1983 damages award should be to compensate persons for injuries caused by the deprivation of constitutional rights. *Carey v. Piphus,* 435 U.S. 247, 254, 98 S.Ct. 1042, 1047, 55 L.Ed.2d 252 (1978); *Kincaid v. Rusk,* 670 F.2d 737, 745–46 (7th Cir.1982).

In this case, Ronald Sherrod's death was caused by the constitutional deprivation for which compensation was sought. Section 1983, and the applicable provisions of the Fourteenth Amendment, protect life. It is well established in this and other circuits that on the facts alleged, and on the evidence the jury heard, the estate of Ronald Sherrod could sue and recover damages for the loss of his life. *Bell v. City of Milwaukee,* 746 F.2d 1205, 1236 (7th Cir.1984); *O'Connor v. Several Unknown Correctional Officers,* 523 F.Supp. 1345, 1348 (E.D.Va.1981); *cf. Guyton v. Phillips,* 532 F.Supp. 1154, 1166 (N.D.Calif.1981).

"Life," Blackstone has reminded us, "is the immediate gift of God, a right inherent by nature in every individual...." 1 W. Blackstone, *COMMENTARIES* \*129; *Evans v. The People,* 1 Cow.Cr.R. 494, 501 (N.Y.1872) (Grover, J., dissenting). The deprivation of life that is prohibited by the Fourteenth Amendment includes "not only of life [itself], but of whatever God has given to everyone with life for its growth and enjoyment...." *Munn v. Illinois,* 4 Otto 113, 142, 94 U.S. 113, 142, 24 L.Ed. 77 (1876) (Field, J., dissenting). In other words, the loss of life means more than being deprived of the right to exist, or of the ability to earn a living; it includes deprivation of the pleasures of life.

This is the point that Smith discussed with the jury when he told them about "the hedonic value of life." As he explained to them, "hedonic" refers "to the larger value of life...." This includes the pleasure of living which is destroyed by the blow that is lethal; in this case, the fatal pistol shot that Berry fired into the temple of Ronald Sherrod, a mere youth; and thus taking from him what all the wealth in the world could never purchase. Smith's expert testimony enabled the jury to consider this important aspect of injury which the estate of

Ronald Sherrod suffered, an aspect they should have considered in the event they determined that Lucien Sherrod, as administrator, was entitled to a judgment against the defendants.

All competent evidence tending to establish a legitimate item of damage is, under proper pleadings, relevant and admissible. *In re Air Crash Disaster Near Chicago, Ill.*, 701 F.2d 1189, 1195 (7th Cir.1983); *see Har-Pen Truck Lines, Inc. v. Mills*, 378 F.2d 705, 711 (5th Cir.1967); *De Koven Drug Co. v. First National Bank of Evergreen Park*, 27 Ill.App.3d 798, 802, 327 N.E.2d 378, 380–81 (1st Dist.1975). Evidence of all the facts and circumstances of the case having any legitimate tendency to show the damages, or their probable amount, may be admitted for the purpose of enabling the jury to make the most accurate and probable estimate that the nature of the case permits. The fact that the hedonic value of a human life is difficult to measure did not make either Smith's testimony or the damages speculative. Damages are speculative when the probability that a circumstance as an element of compensation is conjectural. The rule against recovery of "speculative damages" is generally directed against uncertainty as to cause rather than uncertainty as to measure or extent. That is, if it is uncertain whether the defendant caused the damages, or whether the damages proved flowed from his act, there may be no recovery of such uncertain damages; whereas, uncertainty which affects merely the measure or extent of the injury suffered does not bar a recovery. *Crichfield v. Julia*, 147 F. 65, 70–71 (2d Cir.1906); *see Calkins v. F.W. Woolworth Co.*, 27 F.2d 314, 319 (8th Cir.1928); *Shannon v. Shaffer Oil & Refining Co.*, 51 F.2d 878, 881 (10th Cir. 1931).

Contrary to what may be the popular view, the idea that an estate can recover for the hedonic value of the life of the person killed is not new in Anglo-American law. In England, for example, hedonic damage awards have been allowed since 1976. Section 1 of the Law Reform (Miscellaneous Provisions) Act of 1934 has been construed by English judges so that the estate of a person killed can recover for "loss of expectation of life." Prichard, *Personal Injury Litigation*, 137–142 (London 1976); *see also McCann v. Sheppard*, 1 W.L.R. 540 (Ct.of App.Eng.1973). In this country, legal scholars, economists, and social scientists have grappled with the task of formulating a method by which the value of a human life can be measured in terms understood by a jury. *See* Speiser, *Recovery for Wrongful Death 2d, Economic Handbook*, Section 12.5; Broome, *Trying to Value a Life*, 9 Journal of Public Economics 91 (1978); Dardis, *The Value of Life: New Evidence from the Marketplace*, 70 American Economic Review 1077 (1980); Linnerooth, *The Value of Human Life: A Review of Models*, 17 Economic Inquiry 52 (1979). Therefore, the concept, although novel, is not unknown. The testimony of Stanley Smith as an expert in economics enabled the jury to perform its function in determining the proper measure of damages in this case. This court's ruling allowing him to testify concerning "the hedonic value of life" was not error.

So ordered.