**Lucy MERCADO, Individually and as Next Friend of Brian Mercado, a Minor, Plaintiff–Appellant,**

v.

**Salim AHMED and Checker Taxi Company, Incorporated, Defendants–Appellees.**

**No. 91–1530.**

United States Court of Appeals, Seventh Circuit.

Argued Jan. 15, 1992.

Decided Sept. 4, 1992.

James T. Crotty, Zacarias R. Chacon, Timothy F. Kelly (argued), Crotty & Chacon, Chicago, Ill., Karl K. Vanzo, Munster, Ind., for plaintiff-appellant.

Richard G. French (argued), Michael J. Ortyl, John P. Prusik, French, Kezelis & Kominiarek, Chicago, Ill., Howard Goffen, Jesmer & Harris, Chicago, Ill., for defendants-appellees.

Before WOOD, Jr.,* and COFFEY, Circuit Judges, and CURRAN,** District Judge.

COFFEY, Circuit Judge.

In this diversity suit, plaintiff Lucy Mercado ("Mercado"), individually and as next friend of her minor son, Brian, filed a complaint in the district court against defendants Salim Ahmed ("Ahmed") and his former employer, the Checker Taxi Company, Inc. ("Checker"), alleging that due to Ahmed's negligence his taxi struck and injured Brian. The plaintiff further alleged that Checker was negligent in employing Ahmed because he was not qualified to operate the taxi. Mercado sought damages for Brian's personal injuries, pain and suffering, mental anguish, and medical expenses, and for her own mental anguish. The jury found for the plaintiff and awarded $50,000 for Brian's pain and suffering and $29,000 for his medical expenses. The district court judge denied Mercado's motion for a new trial and motion to amend the judgment. On appeal, the plaintiff argues that the jury's verdict was inconsistent and that the judge made several evidentiary errors, and requests a new trial on the issue of damages only. In the alternative, plaintiff asks that we amend the judgment and add to the damages award $2,995,933 for Brian's future medical care and $1,116,836 for Brian's future lost wages. We affirm the verdict of the jury.

* Judge Wood, Jr. assumed senior status on January 16, 1992, after oral argument in this case.

I.

On October 13, 1985, Lucy Mercado traveled to Chicago, Illinois, from her home in Hammond, Indiana, with her four sons—including six-year-old Brian—to visit the Museum of Science and Industry. While walking in the museum parking lot, Brian slipped away from his mother, stepped out onto a crosswalk between two aisles of parked cars, and was struck on the crosswalk by a taxi driven by defendant Ahmed. The impact of the blow threw Brian four or five feet into the air and a distance of about one and one half car lengths.

Brian was taken by ambulance to the University of Chicago, Wyler's Children's Hospital. The boy was examined for an extended period of time, about three to four hours, by a team of doctors and other hospital personnel and then released that same day. According to the information in the hospital records testified to at trial, Brian never lost consciousness, reported no feeling of any pain, and was alert, stable and able to answer the emergency room doctors' questions. An examination of Brian's skull, eyes and ears revealed no signs of head injury. The boy's reflexes, blood pressure, heart rate, and pulse were all normal.

Trial testimony established that Brian, 11 years old, suffered from a wide range of problems prior to the accident. His ability to process visual and auditory information is substantially impaired, making reading, writing, and arithmetic very difficult for him. The boy has been diagnosed as suffering from severe emotional problems and as suicidal. He is unable to perform such rudimentary tasks as dressing properly or managing his personal hygiene. Both the plaintiff's and defendants' witnesses testified that Brian will require some form of institutionalization or structured environment for the remainder of his life. At the time of trial, Brian was a patient in the children's unit of Hartgrove Hospital. His employment prospects are limited to those

** The Honorable Thomas J. Curran, District Judge for the Eastern District of Wisconsin, is sitting by designation.

positions which require the performance of only the most menial tasks.

Mercado argued at trial that Brian's many problems were caused by a closed head injury he suffered when he was struck by the taxi in the museum parking lot, an injury which she claims went undetected the day of the accident. The defendants countered that Brian's myriad problems stem from a condition which predated the taxi accident and are not related to the injuries he suffered when he was struck by Ahmed's taxi. The jury found against both Ahmed and Checker on the plaintiff's complaint, and awarded $29,000 for medical expenses and $50,000 for pain and suffering. The jury awarded no damages for disability from the injury, or for future medical expenses, much less anything for future lost earnings.

## II.

■ Initially, we address the plaintiff's argument that the district court should have ordered a new trial on damages because the jury verdict was fatally inconsistent. Although this is a diversity case, our review of the district court's denial of the plaintiff's motion for a new trial is governed by federal law. *M.T. Bonk Co. v. Milton Bradley Company*, 945 F.2d 1404, 1407 (7th Cir.1991). We will reverse the district court's decision to deny a motion for a new trial only "upon exceptional circumstances showing a clear abuse of discretion." *Cygnar v. City of Chicago*, 865 F.2d 827, 835 (7th Cir.1989). "[W]e will not set aside a jury verdict if a reasonable basis exists in the record to support that verdict." *M.T. Bonk*, 945 F.2d at 1407. "We review damages evidence in the light most favorable to the verdict," *Roggow v. Mineral Processing Corp., Needmore Processing Div.*, 894 F.2d 246, 249 (7th Cir. 1990) (citations omitted), and will "let the verdict stand unless there [is] no rational connection between the evidence on damages and the verdict," *Lippo v. Mobil Oil Corp.*, 776 F.2d 706, 716 (7th Cir.1985) (cita-

tion omitted). We adopt this posture because of our recognition that the "district court, having seen the presentation of evidence and observed the course of the trial, is in a unique position to rule on a new trial motion." *Valbert v. Pass*, 866 F.2d 237, 239 (7th Cir.1989).

■ With this highly deferential standard of review in mind, we turn to the plaintiff's argument that the jury's verdict was irreconcilably inconsistent. As a federal court sitting in diversity, we must apply state law—in this case the law of Illinois—to resolve the substantive questions. *M.T. Bonk*, 945 F.2d at 1407. The plaintiff correctly points out that, under Illinois law,[1] verdicts returned in the same action which are legally inconsistent should be set aside and a new trial granted. *Wottowa Ins. Agency, Inc. v. Bock*, 104 Ill.2d 311, 84 Ill.Dec. 451, 453, 472 N.E.2d 411, 413 (1984).[2] In support of her position that the instant verdict was inconsistent, the plaintiff cites four Illinois cases in which jury verdicts were overturned on appeal on grounds of inconsistency. In three of these cases, *Healy v. Bearco Management, Inc. and Bear & Sons, Inc.*, 216 Ill.App.3d 945, 160 Ill.Dec. 241, 249, 576 N.E.2d 1195, 1203 (1991), *Kumorek v. Moyers*, 203 Ill. App.3d 908, 148 Ill.Dec. 906, 909, 561 N.E.2d 212, 215 (1990), and *Hinnen v. Burnett*, 144 Ill.App.3d 1038, 99 Ill.Dec. 76, 82, 495 N.E.2d 141, 147 (1986), the verdicts were reversed as being inconsistent because the juries awarded the plaintiffs compensation for the medical costs related to the treatment of pain, and refused to award damages for past pain and suffering. In the fourth case, *Schranz v. Halley*, 128 Ill.App.3d 125, 83 Ill.Dec. 243, 244, 469 N.E.2d 1389, 1390 (1984), the verdict was set aside because the jury awarded damages for medical expenses but not for the past pain and suffering which necessarily accompanied the injury for which the defendant was held liable. In each of these cases, the appellate court concluded that the verdicts were inconsistent because it

---

1. Both parties agree that Illinois law is the governing substantive law of the case.

2. As we make clear later in this opinion, we do not believe that the verdict in the instant case was legally inconsistent.

was unable to understand why the juries failed to award damages for past pain and suffering.

■ The plaintiff attempts to depict the verdict in the instant case as afflicted with this same inconsistency. Her argument runs as follows: The jury's finding of liability on the part of the defendants and its award of $29,000 in medical costs to the plaintiff represented an award of damages equal in amount to all of Brian's medical expenses up to the time of trial, including treatment for his ongoing mental, emotional, and behavioral problems. To grant this award the jury must have necessarily found that the taxi accident caused the problems for which Brian sought treatment. Having made this finding, it was inconsistent for the jury not to award damages for Brian's future medical expenses, future loss of wages, and future disabilities, since these expenses would arise from the same malady which caused the plaintiff's pretrial medical expenses. In short, Mercado contended that if the jury found the defendants liable for Brian's pre-trial medical expenses as a result of the accident, then it was required to find them liable for all future damages.

The plaintiff's argument that the jury's verdict was inconsistent is not entirely implausible. However, we agree with the district court that there are other interpretations of the jury's verdict just as persuasive as the plaintiff's. As the district court stated in rejecting the plaintiff's inconsistency argument, the jury's verdict was based on its finding that Brian Mercado was injured by the taxi as a result of the defendant driver's negligence, which negligence was chargeable to the taxi company. After making this finding, the jury was required to determine "to what extent was Brian injured by the taxicab and what *sequelae* followed from that injury." The court explained that the plaintiff presented substantial evidence that Brian was mentally and emotionally in "sound condition" before the accident and in "very poor condition mentally and emotionally after the accident." However, the district court pointed out that the defense countered with

equally competent evidence establishing that the injuries Brian suffered when he was struck by the taxi "simply could not account for the depth of damage to Brian's condition or to the depth of his deviation from the norm." In analyzing the jury verdict, the district court took special note of the testimony of Angelica Young, Brian Mercado's kindergarten teacher, who testified that Brian suffered from severe learning and functioning disabilities in class *before* the taxi accident. The district court characterized Young as the "one unpaid and apparently disinterested witness" and concluded that "the explanation for the jury's verdict is they accepted the testimony of the kindergarten teacher." According to the district court, the award of zero dollars for future medical expenses, disability and lost wages reflected the jury's determination that the taxi accident was not responsible for Brian's current physical, mental and emotional problems. The district court concluded that the jury's award of an amount equal to the plaintiff's pretrial medical expenses was not "logically and necessarily inconsistent with the verdict they reached on the far more important question of the case, which was the relationship of the taxicab accident to the longstanding permanent disablement of Brian Mercado."

We agree, and hold that the district court did not abuse its discretion in denying the plaintiff's motion for a new trial and in refusing to overturn the jury verdict on inconsistency grounds. As we noted above, in reviewing a challenge to a damages verdict, we view the evidence in the light most favorable to the verdict, *Roggow*, 894 F.2d at 249, and will not overturn the verdict unless we can find no rational connection between it and the evidence presented, *Lippo*, 776 F.2d at 716. In their appellate brief, the defendants offer two readings of the jury verdict in support of their view that it was consistent. In their first explanation, the defendants focus on the instruction given to the jurors which told them that if they found the defendants liable for the accident, they should then "fix the amount which will reasonably and fairly compensate Brian Mercado for any

of the following elements of damages proved by the evidence to have resulted from the negligence of the Defendants...." Included among these damages elements was the "aggravation of any pre-existing aliment or condition." The defendants maintain that the jury could have decided to award the plaintiff $29,000 in medical costs and $50,000 for pain and suffering in the belief that Brian's underlying mental, physical and emotional problems were aggravated by the injuries he suffered when he was struck by the taxi. Such a finding by the jury would not be inconsistent with compensating the plaintiff for the bills submitted for medical expenses up to the moment of trial.

The defendants offer a second reading in defense of the jury verdict. They argue that the jury could have concluded that once Lucy Mercado was advised (as she was) by medical specialists that there were indications that the taxi accident caused Brian to suffer a closed head injury, she prudently sought additional medical evaluation and treatment in reliance upon this advice. The jury was instructed to award the plaintiff the "reasonable expense of necessary medical care, treatment and services" which resulted from the defendants' negligence. The defendants argue that, pursuant to this instruction, the jury could have decided that the $29,000 was owed the plaintiff because the injuries Brian suffered when he was hit by the taxi gave rise to a reasonable belief by his mother that he had suffered a closed head injury. This reasonable belief, according to the defendants, resulted in Lucy Mercado seeking medical care for her son and incurring expenses for which the defendants were liable because their negligence caused the accident which gave rise to the belief that Brian had suffered a closed head injury.

The defendants' proffered explanations of the jury verdict are speculative, as is the plaintiff's argument that the verdict was inconsistent. Neither the litigants nor the district court (nor do we) know with certainty the reasoning which lead the jurors to reach their verdict. In the face of this uncertainty, we àccord the district court broad discretion in determining whether the plaintiff's inconsistency argument is so persuasive, and the defendant's consistency argument so unpersuasive, that the jury verdict should be overturned and a new trial held on damages, or whether the jury's damages verdict should be increased. *See Trzcinski v. American Cas. Co.,* 953 F.2d 307, 315 (7th Cir.1992); *M.T. Bonk,* 945 F.2d at 1407; *Roggow,* 894 F.2d at 249; *Lippo,* 776 F.2d at 716. We adopt this deferential posture because, as noted above, the "district court, having seen the presentation of evidence and observed the course of the trial, is in a unique position to rule on a new trial motion." *Valbert,* 866 F.2d at 239. Unlike the Illinois cases cited by the plaintiff and discussed above, the instant verdict was not necessarily irreconcilably inconsistent. Thus, the experienced trial judge's refusal to invoke the extraordinary remedy of a new trial on damages was a reasonable exercise of his discretion, and one that we will not disturb on appeal. Given this conclusion, we likewise reject the plaintiff's request that we amend the jury verdict by awarding her damages for Brian's future medical expenses and future lost wages.

### III.

The plaintiff also argues that the trial judge committed four evidentiary errors, each of which require a reversal of the damages verdict and a new trial on damages. We will address the claimed errors *seriatim.*

### A.

■ The first alleged evidentiary error centers on the district court's refusal to allow the receipt in evidence of the testimony of Stanley Smith. Smith was offered by the plaintiff as an expert on the disability damages owed Brian Mercado because of the "pleasure of living" the boy will be denied as a result of the injuries he received in the taxi accident. Smith, a professional economist who holds a Masters degree in Business Administration from the University of Chicago, would have testified as to the monetary value of "the

reduction of Brian's ability to engage in and experience the ordinary value of life that he was experiencing prior to the injury." Appellant's brief at 14. These damages are sometimes referred to as "hedonic damages." [3]

The district court conducted an extensive *voir dire* to determine the method Smith employs in calculating the monetary value of the "lost pleasure of living" an individual such as Brian suffers due to an injury. Smith testified that in his computation he first assumes a "percentage range" representing the degree an injured individual's capacity to experience life has been diminished. This method measures an individual's impairment in four areas: occupational, practical functioning, emotional, and social functioning. Smith does not compute this figure himself, but instead consults with a medical expert to arrive at the appropriate range. In this case the expert was Dr. Kathleen Pueschel, a clinical neuropsychologist. According to the plaintiff, Dr. Pueschel concluded that Brian's disabilities were "severe", and that the boy's capacity to experience life was diminished 66% to 83%.

Smith then applies his own analysis to the diminished capacity figure. As the district court noted, the method attempts to get at the value of life by indirection; no one is ever asked "what is the monetary value of living?", because most people would probably respond that life is priceless, scuttling the endeavor. Instead, Smith focuses on how much Americans are willing to pay for reductions in health and safety risks, and how much they are compensated for assuming extra risk. This method, according to Smith's economic theory, reveals the value we actually place on living, and avoids the astronomical answers people would give in response to a hypothetical question. He relies on three types of willingness-to-pay studies: studies of how much consumers, through the purchase of devices such as smoke detectors and seat belts, pay for increased personal safety; studies of how much more people who assume extra risk (*e.g.*, policemen) are paid because their jobs are dangerous; and studies of cost-benefit analyses conducted in the evaluation of government safety regulation. Smith testified that he relied on some 75 such studies in his valuation.

Through this analysis, Smith concluded that the value of the enjoyment of a statistically average person's life was $2.3 million in 1988 dollars. (The statistically average person is 31 years old with a 45 year additional life expectancy.) This averages out to approximately a $60,000–per-year value on the enjoyment of life. Smith took this figure and multiplied it by the percentage range of Brian's loss of the full experience of life, 66% to 83% (drawn from Dr. Pueschel's calculations). Adjusting for Brian's young age, the plaintiff informs us that Smith concluded the value of Brian's lost pleasure of living due to the injuries he suffered in the taxi accident was $2,207,827 to $2,762,227. Appellant's Brief at 15.

■ The district judge, after listening to Smith out of the presence of the jury, ruled, pursuant to Fed.R.Evid. 702,[4] that Smith's proposed testimony on the value of Brian Mercado's lost pleasure of living would not be allowed. The district court provided a thorough and scholarly explanation of the reasoning supporting this decision. *Mercado v. Ahmed*, 756 F.Supp. 1097 (N.D.Ill.1991). The opinion sets out two basic doubts about Smith's testimony. First, the court was troubled by the lack of any "basic agreement among economists as to what elements ought to go into" or "which studies ought to be considered" in life valuation. *Id.* at 1103. In order to allow a witness to testify as an expert, the court must be convinced that the witness

---

3. Defendants do not argue that damages for the lost pleasure of living are unavailable under Illinois law. Thus, we, like the district court, will assume their availability in our consideration of the admissibility of Smith's testimony. *Mercado v. Ahmed*, 756 F.Supp. 1097, 1102 (N.D.Ill.1991).

4. Fed.R.Evid. 702 provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise."

will rely only upon evidence a reasonable expert in the field would rely. *United States v. Lundy,* 809 F.2d 392, 395 (7th Cir.1987). The court determined that no consensus existed among economists as to what was proper evidence of the value of living.

The district court's second and more significant concern centered on Smith's methodology. The court reasoned that Smith's valuation, based as it was on studies meant to determine how much Americans pay to reduce risks or charge for assuming them, did not qualify as the sort of "scientific, technical or other specialized" knowledge contemplated in Fed.R.Evid. 702. Referring to Smith's method of valuing life, the district court observed:

"Survey of attitudes and views of others as a basis for concluding something is true is not necessarily wrong. Some science as it comes into court is the result of consensus by practitioners of some area of expertise that a certain law of nature is correct. What is wrong here is not that the evidence is founded on consensus or agreement, it is that the consensus is that of persons who are no more expert than are jurors on the value of life. Even if reliable and valid, the evidence may fail to 'assist the trier of fact to understand the evidence or determine a fact in issue' [quoting Fed.R.Evid. 702] in a way more meaningful than would occur if the jury asked a group of wise courtroom bystanders for their opinions."

*Mercado,* 756 F.Supp. at 1103.

■ A witness who knows no more than the average person is not an expert. The "theory upon which expert testimony is ... [admitted] is that such testimony serves to inform the court about affairs not within the full understanding of the average man." *United States v. West,* 670 F.2d 675, 682 (7th Cir.), *cert. denied sub. nom., King v. United States,* 457 U.S. 1124, 102 S.Ct. 2944, 73 L.Ed.2d 1340 (1982) (quoting *United States v. Webb,* 625 F.2d 709, 711 (5th Cir.1980)). As the Supreme Court has noted,

"expert testimony not only is unnecessary but indeed may properly be excluded in the discretion of the trial judge 'if all the primary facts can be accurately and intelligibly described to the jury, and if they, as men of common understanding, are as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training, experience, or observation in respect of the subject under investigation.'"

*Salem v. United States Lines Co.,* 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962) (citation omitted).

The district court, confronting this novel legal problem,[5] was not persuaded that Smith's technique for valuing the lost pleasure of living provided expert assistance to the jury. On appeal, the plaintiff attacks the reasoning of the trial judge directly, asserting that Smith should have been given the "opportunity to supplant the jurors' own knowledge as to the value of life ...." Appellant's reply brief at 11. This frames the issue precisely: does Stanley Smith, supported by his extensive willingness-to-pay research, know better than the average juror how much life is worth?

As we noted above, the district judge did not believe that Smith offered the jury any "expertise" because (1) no consensus

---

**5.** One district court in this circuit allowed Smith to testify as to the value of the lost pleasure of living in a 42 U.S.C. § 1983 wrongful death suit, *Sherrod v. Berry,* 629 F.Supp. 159 (N.D.Ill.1985). That decision was initially affirmed by a panel of this court, 827 F.2d 195 (7th Cir.1987), but then vacated, 835 F.2d 1222 (7th Cir.1988), and eventually reversed *en banc* on other grounds, 856 F.2d 802 (7th Cir.1988), although our *en banc* opinion stated that the district court should consider the issues left undecided "in light of this court's prior discussion of those matters, specifically those found in our earlier vacated opinion." 856 F.2d at 807–808. One Illinois appellate court, in a wrongful death case, affirmed a ruling barring testimony by Stanley Smith on the economic value of the deceased's loss of enjoyment of life because it concluded that the damages were not "amenable to such analytic precision" and Smith's testimony would be "overly speculative" and "invade the province of the jury." *Fetzer v. Wood,* 211 Ill.App.3d 70, 155 Ill.Dec. 626, 635, 569 N.E.2d 1237, 1246 (1991).

among experts supported Smith's method of valuing life and (2) Smith's research was no more than a compilation of the opinions, expressed through spending decisions, of a large number of Americans as to the value of life. The first criticism is irrefutable: the plaintiff could point to no expert consensus supporting Smith's methodology. The second criticism is also on the mark, since Smith concedes that his method relies on arriving at a valuation of life based on analyzing the behavior of non-experts.

However, even accepting Smith's premise that his method of determining the value of life is different in an important way from submitting the question to a jury because it focuses on observable behavior and not opinion, we have serious doubts about his assertion that the studies he relies upon actually measure how much Americans value life. For example, spending on items like air bags and smoke detectors is probably influenced as much by advertising and marketing decisions made by profit-seeking manufacturers and by government-mandated safety requirements as it is by any consideration by consumers of how much life is worth. Also, many people may be interested in a whole range of safety devices and believe they are worthwhile, but are unable to afford them. More fundamentally, spending on safety items reflects a consumer's willingness to pay to reduce *risk*, perhaps more a measure of how cautious a person is than how much he or she values life. Few of us, when confronted with the threat, "Your money or your life!" would, like Jack Benny, pause and respond, "I'm thinking, I'm thinking." Most of us would empty our wallets. Why that decision reflects less the value we place on life than whether we buy an airbag is not immediately obvious.

The two other kinds of studies Smith relies upon are open to valid and logical criticism as well. To say that the salary paid to those who hold risky jobs tells us something significant about how much we value life ignores the fact that humans are moved by more than monetary incentives. For example, someone who believes police officers working in an extremely dangerous city are grossly undercompensated for the risks they assume might nevertheless take up the badge out of a sense of civic duty to their hometown. Finally, government calculations about how much to spend (or force others to spend) on health and safety regulations are motivated by a host of considerations other than the value of life: is it an election year? how large is the budget deficit? on which constituents will the burden of the regulations fall? what influence and pressure have lobbyists brought to bear? what is the view of interested constituents? And so on.

All this is not to imply that we can state conclusively that Smith's approach is devoid of any merit. But given that "we review a district court's decision to exclude expert testimony under an abuse of discretion standard," *United States v. Welch*, 945 F.2d 1378, 1381 (7th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1235, 117 L.Ed.2d 469 (1992), and that the trial court's "determination will be affirmed unless it is 'manifestly erroneous,' " *Carroll v. Otis Elevator Company*, 896 F.2d 210, 212 (7th Cir.1990) (quoting *Bob Willow Motors Inc. v. General Motors*, 872 F.2d 788, 797 (7th Cir.1989)), we can say with confidence that the district court's decision to bar Smith's testimony was not reversible error. Smith has taken up a daunting task: to develop a methodology capable of producing specialized knowledge to assist jurors in determining the monetary value of being alive. The district court ruled that, despite Smith's training, extensive research and countless calculations, his testimony would not aid the jury in evaluating the evidence and arriving at its verdict (the true test of expert testimony under Fed. R.Evid. 702) because Smith was no more expert in valuing life than the average person. This conclusion may be less a reflection of the flaws in Smith's methodology than on the impossibility of any person achieving unique knowledge of the value of life.

### B.

The plaintiff's second evidentiary argument is that the district court erred when it refused to allow her to call Rita

Nicksic, the room mother in Brian's kindergarten class, as a rebuttal witness on the afternoon of the last day of the trial, after Angelica Young, Brian's kindergarten teacher, had testified. The plaintiff attempted to call Nicksic to rebut Young's testimony that Brian had severe difficulties functioning in class *before* the taxi accident. The plaintiff contends that Nicksic would have testified that Brian's classroom troubles began after the accident. The district court agreed that Nicksic's proposed testimony was rebuttal, but ruled that calling her as a witness constituted "unfair surprise" to the defendants.

The defendants argue that Nicksic's testimony was properly excluded because the plaintiff failed to disclose to either the court or the defendants that Nicksic was a potential witness until she was called to the stand. The defendants claim they had no prior knowledge of Nicksic's identity or the nature of her testimony and that her surprise presentation by the plaintiff ·at the end of the trial precluded them from conducting discovery and otherwise properly preparing for cross examination. The defendants also point out that the plaintiff knew of the kindergarten teacher (Young) and could easily have deposed her to discover her views of Brian's classroom performance and prepare for her testimony. In fact, it is undisputed that plaintiff's attorney interviewed Young less than a week before she was called by the defendants to testify.

"It is well established that the admission of rebuttal evidence lies within the sound discretion of the trial court and appellate courts will not interfere with the trial court's ruling unless there is a clear abuse of discretion." *United States v. Gaertner,* 705 F.2d 210, 217 (7th Cir.1983), *cert. denied,* 464 U.S. 1071, 104 S.Ct. 979, 79 L.Ed.2d 216 (1984). Plaintiff's counsel's apparent surprise at the nature of Young's testimony was caused by *its own failure to prepare for her testimony.* To have allowed Nicksic's testimony would have forced the defendants to conduct a witness examination (of Nicksic) for which they were unprepared because of the plaintiff's failure to anticipate Young's testimony, even though plaintiff's attorneys had interviewed Young less than a week before her trial testimony. It was not an abuse of discretion to bar Nicksic's testimony.

### C.

Plaintiff's third claimed evidentiary error centers on the testimony of Dr. Jack Troy, Brian's pediatrician. Troy was called as a witness by the defendants, who questioned him about his various examinations of Brian. The plaintiff contends that the defendant's questioning left the jury with the false impression that Troy had not noticed any change in Brian after the taxi accident.

Troy, who, as the trial court noted, "had some level of confusion about dates and times and places", relied heavily on his written patient records in testifying about his observations of Brian. His only record entry for October 5, 1988 was, "Consultation with mother. See sheet. Try Ritalin." This testimony was elicited by the defendants. On cross examination, plaintiff's attorney questioned Troy about the October 5 consultation. Troy indicated that he could not remember if he saw Brian that day or only met with his mother, and that reviewing his deposition testimony (taken October 27, 1988) would not be helpful because he could not trust his recollection on that point.

The plaintiff contends that had her attorney been permitted to use leading questions in her examination of Troy, Troy would have testified that Brian was a normal boy before the taxi cab accident, but when he last saw the boy before trial, on October 5, 1988, Brian was "hyperactive and butting in and running around the room and jumping on the table." Appellant's Brief at 25.

▮▮▮ The abuse of discretion standard again controls. *United States v. Carter,* 910 F.2d 1524, 1530 (7th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1628, 113 L.Ed.2d 724 (1991). "Moreover, because the management of cross-examination is peculiarly committed to the district court's discretion, *United States v. Alvarez,* 833 F.2d 724, 729 (7th Cir.1987), 'the effect is to confine the matter largely to the trial level and to remove it from the area of profita-

ble appellate review.' *McCormick on Evidence,* § 24 n. 6 (3d ed. 1984)." *Id.*

We are of the opinion that the district court did not commit an abuse of discretion in managing the cross examination of Dr. Troy. Troy, during his cross examination, stated that he could not remember if he had seen Brian on October 5, 1988, and that he considered his deposition testimony on the matter untrustworthy. We fail to see how any more could have been elicited from the doctor about the October, 1988 visit even if the plaintiff had been allowed to ask leading questions. We also note that Troy testified that he was interviewed by plaintiff's attorney just days before testifying, and thus he could have been called to testify by the plaintiff had her attorneys believed he possessed information helpful to her case.

## D.

■ The plaintiff's final claim of evidentiary error is that the district court improperly limited her cross examination of Dr. Jeri Morris, one of the defendants' expert witnesses. The deferential standard of review of a district court's management of cross examination, set out above, applies here as well. Morris, a neuropsychologist, testified that her review of Brian's medical and school records disclosed no evidence that he sustained a closed head injury when he was struck by the taxi. The plaintiff claims that she should have been permitted to impeach Morris' testimony with a paramedics report stating that Brian had suffered a head injury, or at least been permitted to show that Morris' opinion was based on an incomplete investigation. Plaintiff also asserts that she should have been permitted to impeach Morris with articles written by her and others describing the difficulty of diagnosing closed head injuries in emergency room settings. Plaintiff also claims that it was error not to allow her to question Morris about her knowledge of the facts of the accident.

■ We find no merit in these allegations of error. The plaintiff established on cross examination that Morris had not reviewed the paramedics' report, thus making the point that Morris had not reviewed *all* of Brian's medical records. Moreover, the paramedics report was never introduced into evidence, and, in fact, plaintiff's attorney agreed on the record not to attempt to introduce that portion of the report referring to witness statements that Brian had suffered a head injury. As to the medical articles, Morris testified that they concerned situations in which closed head injuries are not diagnosed *in patients who have suffered dramatic spinal cord injury.* This information, describing the content of the articles and distinguishing them from the facts involved in the instant case, was elicited during plaintiff's cross examination. Plaintiff's final argument is that she should have been permitted to question Morris about the details of the accident, apparently to emphasize that Morris had not witnessed that accident. But Morris made clear that her testimony was based on her review of Brian's medical record, not as an eye witness to the accident, rendering plaintiff's proposed line of questioning pointless. The district court did not abuse its discretion in managing Morris' cross examination.

## IV.

The verdict of the jury is AFFIRMED.