102 P.3d 52 (2004)
Otho Lee BANKS, as Guardian Ad Litem for James Lee BANKS, Jr.; and James Lee Banks, Jr., Individually, Appellants/Cross-Respondents,
v.
SUNRISE HOSPITAL, Respondent/Cross-Appellant.
No. 38801.
Supreme Court of Nevada.
December 17, 2004.
*56 Albert D. Massi, Ltd., and Patricia J. Bowling, Las Vegas; Myers & Gomel, P.C., and Jeffrey R. Gomel, Las Vegas, for Appellants/Cross-Respondents.
Dennett & Winspear, LLP, and Ryan L. Dennett, Las Vegas; Hall, Prangle & Schoonveld, LLC, and Kenneth M. Webster, Las Vegas; Cooper & Scully, P.C., and R. Brent Cooper and Diana L. Faust, Dallas, Texas, for Respondent/Cross-Appellant.
Before the Court En Banc.

OPINION
AGOSTI, J.
On August 25, 1995, James Banks, Jr. (James), while undergoing rotator cuff surgery at Sunrise Hospital, suffered cardiac arrest. James has since that time persisted in a permanent vegetative state. James and his guardian ad litem, Otho Lee Banks (collectively, Banks) sued Sunrise Hospital, the surgeon and the anesthesiologist. The surgeon and anesthesiologist settled with Banks shortly before trial. A jury found Sunrise liable for James's injury and awarded substantial damages. Subsequently, the district court reduced the jury award by the sums paid by the surgeon and the anesthesiologist in settlement of Banks's claims against them and entered judgment in that amount. It later denied Sunrise's motion for a new trial.[1] Sunrise appeals, alleging that various reversible errors occurred at trial, and Banks cross-appeals, challenging the district court's reduction of the jury award.
We conclude that Sunrise has failed to demonstrate error that would entitle it to a reversal or a new trial. We also conclude that the district court properly reduced the jury award by the sums paid in settlement by the surgeon and the anesthesiologist. Accordingly, we affirm the district court's judgment and order.

FACTUAL BACKGROUND
On August 25, 1995, fifty-one-year-old James Banks, Jr., was admitted to Sunrise Hospital for rotator cuff surgery. Prior to the surgery, the orthopedic surgeon, Dr. James Manning, discussed with James the risks of the surgery. Additionally, Dr. Robert L. Kinsman, the anesthesiologist, discussed the risks associated with the use of anesthesia. James signed an informed consent form that detailed the risks associated with surgery and with anesthesia.
Doctors performed surgery on James in operating room number 8, utilizing the hospital's equipment, which included a Narkomed II anesthesia machine. The Narkomed II provides oxygen and anesthetic agents to patients. Only anesthesiologists are qualified to operate the Narkomed II. Dr. Kinsman, an independent contractor hired by Sunrise to operate the equipment during James's surgery, utilized the equipment to anesthetize James and to monitor his physiological condition.
Immediately before James's surgery, Dr. Manning performed surgery on a different patient in operating room number 8, for which Dr. Kinsman was also the anesthesiologist and had used the same equipment. During the course of the first surgery, the equipment presented no problems. Dr. Kinsman checked the anesthesia and monitoring equipment before using it in James's surgery.
*57 During the course of James's surgery, Dr. Kinsman monitored James's condition continuously. Near the end of surgery, Dr. Kinsman noticed a decrease in James's blood pressure. Concerned that the blood pressure would continue to decrease, Dr. Kinsman turned off the nitrous oxide, decreased the anesthesia and increased the oxygen. About a minute later, James's blood pressure dropped again. Dr. Kinsman administered Robinal to increase the heart rate, which would then increase blood pressure, but to no avail. As James's blood pressure was still dropping, Dr. Kinsman turned off all of the anesthetic agents and gave James one hundred-percent oxygen. He also administered ephedrine to increase the pulse rate and blood pressure. Dr. Kinsman checked the endotracheal tube, the circuit ventilation of the Narkomed II and the placement of the intravenous tube (IV) in an attempt to find out what was wrong. After a second administration of ephedrine, James went into cardiac arrest. Dr. David Navratil, a cardiologist, was summoned and assisted Doctors Manning and Kinsman in an effort to resuscitate and stabilize James. Physicians attempted a precordial thump to shock James's heart back to a normal rhythm, attempted cardiopulmonary resuscitation, gave James atropine to get his heart started and administered electrical shock twice before James was finally resuscitated. Concerned that the open shoulder wound would become infected, and to alleviate the need for future surgeries, physicians finished the surgery. Dr. Kinsman was unsure of the cause of James's cardiac arrest but stated that James was stable for completion of the shoulder surgery. The physicians continued to use the same equipment to complete the surgery. Following surgery, James failed to regain consciousness and has since persisted in a permanent vegetative state.
Immediately after the incident, Sunrise completed an occurrence report. The report did not indicate any problems with the anesthesia equipment, and therefore, the equipment continued to be used in Sunrise's operating rooms for several months following James's injury until November 1995, when Sunrise sold the Narkomed II anesthesia machine involved in James's surgery, along with several other Narkomed II machines, to the same buyer. The sale was pursuant to a contract executed by Sunrise several months before James's surgery. As part of the construction of new operating rooms, Sunrise's parent corporation had contracted to purchase new anesthesia equipment to standardize the equipment and as part of the normal replacement of equipment. Prior to the transfer, Sunrise received no complaints concerning any of the equipment.
On April 24, 1996, James and Otho Lee Banks, as guardian ad litem for James, brought negligence claims against Sunrise, Dr. Kinsman and Dr. Manning in a complaint to the Medical Legal Screening Panel. Banks did not allege negligent maintenance or any cause of action concerning equipment malfunction. Banks relied upon an affidavit of anesthesiologist Dr. Casey Blitt, who stated that Dr. Kinsman's care fell below the standard of care in that he failed to "recognize, respond to and reverse decreasing blood pressure and pulse rate in the absence of blood loss," and that he failed "to use appropriate resuscitation protocol including, but not limited to[,] failure to use the appropriate drugs of choice in this setting." Dr. Blitt further opined that James "sustained permanent, irreversible hypoxic brain damage." The Panel determined that there was no reasonable probability of medical malpractice on the part of Dr. Manning or Sunrise, but was unable to reach a decision as to Dr. Kinsman. Shortly thereafter, Banks sued Dr. Manning, Dr. Kinsman and Sunrise. The complaint did not allege negligent maintenance against Sunrise, although it did contain a Doe/Roe allegation of negligent maintenance of the equipment.[2]
On March 2, 1999, nearly four years after James's injury and more than two years after filing the complaint, Banks was granted leave, over Sunrise's objection, to file a first *58 amended complaint in which Banks asserted an additional claim of negligence pertaining to the anesthesia equipment. The district court directed Banks to file a second amended complaint alleging faulty or negligent maintenance of equipment and to also include the previously alleged res ipsa loquitur claim. The district court dismissed all other claims. On the eve of trial, Banks settled with both Dr. Manning and Dr. Kinsman.
Before trial, Banks sought sanctions against Sunrise based upon Sunrise's failure to preserve the anesthesia equipment that had been used during James's surgery. The district court determined that Sunrise's failure to identify the specific machines used during James's surgery before selling the anesthesia equipment constituted spoliation of evidence and so, as a sanction the district court instructed the jury that:
Sunrise Hospital had a duty to identify all of the anesthesia equipment and monitors which were used in the Banks surgery. Defendant Sunrise failed in this duty and because of its failure, no independent review or inspection of the equipment could ever be done. You may infer that had the equipment been preserved and tested that it would have been found to be not operating properly.
The first jury trial resulted in a mistrial because of a hung jury. The case was reassigned to another judge, who, over Sunrise's objection, refused to reconsider the above-described sanction excluding evidence. At the second trial, the jury rendered a verdict in favor of Banks, awarding $5,412,030.88 in damages, which totaled $6,903,044.61 after adding the prejudgment interest on the past damages. The district court subsequently reduced the jury award by the combined $1.9 million paid in settlement by Doctors Manning and Kinsman[3] and entered a second amended judgment in the amount of $4,825,450.17. The district court then denied Sunrise's motion for judgment notwithstanding the verdict or a new trial. Sunrise thereafter timely appealed from the second amended judgment and the order denying its new trial motion, assigning numerous errors in the district court proceedings. Banks also appealed, contesting the district court's reduction of the jury award by the sums paid in settlement of his claims against Doctors Manning and Kinsman.[4]

DISCUSSION

Sanctions and adverse inference instruction
Sunrise contends that the district court abused its discretion when it imposed sanctions against Sunrise for spoliation of evidence. We have held that "discovery sanctions are within the power of the district court and this court will not reverse the particular sanctions imposed absent a showing of abuse of discretion."[5]
When a potential for litigation exists, "`the litigant is under a duty to preserve evidence which it knows or reasonably should know is relevant to the action.'"[6] Here, James's cardiac arrest while under anesthesia and his subsequent persistent vegetative state put Sunrise on notice that an error may have occurred in the operating room, whether caused by the physicians or the equipment and, therefore, that litigation was foreseeable. Consequently, Sunrise had a duty to preserve information relating to the attending physicians and the equipment.
Here, although Sunrise had a prearranged contract to sell the anesthesia equipment, after James's injury, it was on notice that certain equipment could be the subject of litigation. In fact, if the equipment had been functioning properly, it is reasonable under any circumstance to infer that Sunrise would have wanted to preserve it in order to protect itself from a false claim of negligence. Moreover, the district court heard expert testimony that the medical industry was *59 aware of a problem with Narkomed II anesthesia machines relating to improperly maintained or checked interlock devices. In addition, testimony was presented that Sunrise had a duty, when faced with a cardiac arrest for no apparent reason, to identify and sequester the equipment until Sunrise investigated and determined whether the equipment was a factor in the cardiac arrest and oxygen deprivation.
Given this evidence, the district court determined that Sunrise had, at the very least, a duty to record the machine's serial numbers. Sunrise's failure to document which machines were used in James's surgery prevented Banks from investigating the machinery's functionality as part of the investigation of James's injury. Accordingly, we perceive no abuse of discretion on the part of the district court in imposing sanctions, including the court's decision to instruct the jury that it could draw an adverse inference concerning the functionality of the equipment based upon Sunrise's failure to preserve it. We note, in passing, that the district court did not instruct the jury that it shall draw an adverse inference from Sunrise's disposal of the equipment, only that that it may draw an adverse inference. Under the facts of this case, the district court did not abuse its discretion in imposing sanctions even though there was no evidence that Sunrise willfully disposed of the machines in order to frustrate discovery in subsequent litigation proceedings. We emphasize that our holding is limited to the facts of this case, considering the catastrophic nature of James's injury, the unique position of Sunrise and its knowledge concerning the incident, and should therefore be narrowly construed.

Res ipsa loquitur
Sunrise contends that the district court abused its discretion when it submitted a res ipsa loquitur instruction to the jury. "[A] party is entitled to jury instructions on every theory of her case that is supported by the evidence."[7] We will review a district court's decision to give a particular instruction for an abuse of discretion or judicial error.[8]
NRS 41A.100 has replaced the doctrine of res ipsa loquitur in medical malpractice cases.[9] A rebuttable presumption of medical malpractice applies when the plaintiff has provided some evidence of one of the factual predicates enumerated in NRS 41A.100(1).[10] NRS 41A.100(1)(d) provides that a rebuttable presumption of medical malpractice arises when the patient suffers an injury "during the course of treatment to a part of the body not directly involved in the treatment or proximate thereto."
In Johnson v. Egtedar,[11] we held that the district court erred in refusing the appellant's proffered jury instruction on res ipsa loquitur. During surgery to appellant's lower back, the surgeon operated at the wrong level of appellant's spine, puncturing her spinal dura, psoas major muscle, colon and left ureter, causing severe personal injuries. We concluded that the circumstances justified an instruction on NRS 41A.100(1)(d) because the appellant had sought treatment to her lower back but suffered injury to her colon and ureter, parts of the body not directly or proximately related to lower back surgery.[12]
Similarly, in Born v. Eisenman,[13] we concluded that the district court erred when it precluded the appellant from presenting a res ipsa loquitur theory to the jury. Several days after Born underwent surgery to have her uterus and ovary removed, she complained of severe pelvic pain. Doctors determined that Born's left ureter had been ligated during surgery. About a week later, Born underwent a second surgery to repair the ligated ureter. During that procedure, the surgeon also removed a partially diseased *60 right ovary. Over two years later, Born sought treatment for pain in her abdomen, which she had experienced since the second surgery. Doctors discovered that a portion of her small bowel had been cut during the closure procedure from the second surgery.
We concluded in Born that the district court should have instructed the jury based upon NRS 41A.100(1)(e) "because a surgical procedure was performed on the wrong organ or the wrong part of a patient's body."[14] Although Born was decided based upon NRS 41A.100(1)(e) rather than NRS 41A.100(1)(d), the case is nonetheless instructive and its reasoning applies here. Born suffered an injury to her ureter during the course of treatment to her uterus and ovary and later suffered an injury to her bowel during the course of treatment to her ureter and ovary. These facts demonstrate that submission of an instruction under either (d) or (e) would have been appropriate.
The instant case is similar to Johnson and Born. James underwent surgery for treatment to his shoulder, but suffered an injury to his brain, causing his vegetative state. The brain is not directly or proximately related to the rotator cuff surgery. Therefore, the district court did not abuse its discretion when it submitted a res ipsa loquitur instruction to the jury.

Expert testimony
NRS 50.275 provides, "If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by special knowledge, skill, experience, training or education may testify to matters within the scope of such knowledge." Accordingly, the district court may generally admit expert testimony on matters outside the average person's common understanding.[15] Such testimony must also be relevant and its probative value must not be substantially outweighed by the danger of unfair prejudice.[16] Because the admission of expert testimony is in the sound discretion of the district court, we will not reverse the district court's decision absent an abuse of discretion.[17]

Duty to sequester
Sunrise contends that the district court abused its discretion when it permitted Banks to introduce expert testimony on Sunrise's duty to preserve the anesthesia equipment. During the course of trial, Banks's expert witnesses, Robert Morris and Dr. Casey Blitt, testified that Sunrise had a duty to sequester the anesthesia equipment after James's cardiac arrest. At the conclusion of the case, the district court instructed the jury, as we previously discussed, that Sunrise had a duty to identify all the equipment and monitors used in James's surgery.
The evidence concerning Sunrise's duty to preserve the evidence assisted the jury in relation to its prerogative to draw a negative inference from Sunrise's consummated sale of the equipment. Consequently, this evidence assisted the jury in understanding the pertinent issue of whether the anesthesia equipment had malfunctioned during James's surgery. We note that pursuant to NRS 41A.100(1), expert testimony is required in medical malpractice actions to establish the accepted standard of care. We do not believe the district court could therefore be in error in admitting evidence concerning a duty to sequester the equipment, as the existence of such a duty seems to assume a standard of care relevant to the issues being litigated. Therefore, we conclude that the district court did not abuse its discretion when it permitted Banks's experts to testify concerning Sunrise's duty to sequester the equipment.

Opinion testimony
Sunrise contends that the district court abused its discretion when it admitted the opinion testimony of expert Robert Morris *61 concerning the anesthesia equipment's malfunctioning. Sunrise contends that Morris's testimony was speculative and that he could only offer opinions as to mere possibilities and not to a reasonable degree of probability.
As mentioned, NRS 41A.100(1) provides that expert testimony is required in medical malpractice cases to establish the accepted standard of care, a breach of that standard and causation. Generally, "a medical expert is expected to testify only to matters that conform to the reasonable degree of medical probability standard."[18] In United Exposition Service Co. v. SIIS, we concluded that a finding of negligence in a medical malpractice case "cannot be based solely upon possibilities and speculative testimony."[19] In United Exposition, we stated that "[a] testifying physician must state to a degree of reasonable medical probability that the condition in question was caused by the industrial injury, or sufficient facts must be shown so that the trier of fact can make the reasonable conclusion that the condition was caused by the industrial injury."[20] We determined that the speculative nature of the expert's opinion that the injury "`possibly could have been'" a precipitating factor was insufficient to support a finding of causation between the defendant's negligence and the plaintiff's injuries.[21]
During his deposition, Morris described his role in the case as follows: "I have to[,] using my experience and knowledge[,] come up with possible causes of things related to devices that might have contributed to the adverse event." (Emphasis added.) At trial, Morris testified as to the possible ways in which the interlock system on a Narkomed II could fail. At one point, Morris stated that "[a]ny device can fail any time." He also testified that "[e]veryone I have spoken to who had Narkomed 2's for any length of time experienced failures in the interlock system." Finally, Morris admitted that, under the circumstances, he could not determine whether the equipment contributed to James's injury since he was unable to examine the equipment because Sunrise had failed to properly identify which machines were used during James's surgery.
Morris's testimony and opinions established that it was possible for the Narkomed II's interlock device to malfunction intermittently. His testimony was also helpful to establish the standard of care for preserving the identity of the machines and providing grounds for the imposition of sanctions for failure to preserve evidence. It assisted the jury in understanding how the machines could have malfunctioned and why it was reasonable to draw an adverse inference from Sunrise's failure to identify the machines. Accordingly, we conclude that the district court did not abuse its discretion when it permitted Morris to give opinion testimony based on less than a reasonable degree of probability.

Hedonic damages
Sunrise contends that the district court erred in permitting expert testimony concerning the monetary range of hedonic damages, i.e., loss of enjoyment of life damages.
We turn first to whether hedonic damages are a compensable element of damages. The term "hedonic" is derived from the Greek language and refers to the pleasures of life.[22] Hedonic damages are therefore monetary remedies awarded to compensate injured persons for their noneconomic loss of life's pleasures or the loss of enjoyment of life. The Supreme Court of South Carolina has succinctly explained hedonic loss, as distinguished from pain and suffering:
An award for pain and suffering compensates the injured person for the physical *62 discomfort and the emotional response to the sensation of pain caused by the injury itself. Separate damages are given for mental anguish where the evidence shows, for example, that the injured person suffered shock, fright, emotional upset, and/or humiliation as the result of the defendant's negligence.
On the other hand, damages for "loss of enjoyment of life" compensate for the limitations, resulting from the defendant's negligence, on the injured person's ability to participate in and derive pleasure from the normal activities of daily life, or for the individual's inability to pursue his talents, recreational interests, hobbies, or avocations.[23]
Awarding damages for hedonic losses appears to be a recent concept. The long-standing objection to such an award was the "fear of speculativeness and duplication."[24] While the majority of jurisdictions recognize hedonic loss as a recoverable element of damages, the jurisdictions differ as to how hedonic loss should be presented and awarded. In particular, jurisdictions disagree as to whether an expert should be permitted to testify concerning the value of hedonic loss. Some jurisdictions will not permit an expert to testify concerning the value of a person's life on the grounds that the loss is subjective, that the damages are incapable of being accurately measured or that the methods used by experts to measure hedonic losses are unreliable.[25] Other courts permit experts, such as economists, to testify concerning the value of hedonic loss,[26] recognizing that the jury is ultimately responsible for computing damages[27] and that expert testimony will often assist the jury in making its determination.[28]
We agree with these latter jurisdictions. In Nevada, the district court has discretion to qualify a witness as an expert.[29] As noted above, if an expert's "specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue," the expert "may testify to matters within the scope of such knowledge."[30] This rule is tempered by NRS 48.035(1), which prohibits the admission of relevant evidence where its "probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues or of misleading the jury." Furthermore, the jury must find that the "party will probably suffer such damages in the future."[31]
Here, Banks offered Robert Johnson, a forensic economist, as an expert on hedonic damages to assist the jury in determining the monetary value of the pleasure of living that James will be denied as a result of his injury. In cases permitting experts to testify as to the value of hedonic loss, economists have used various methods to arrive at their conclusions.[32] Johnson's methodology for the valuation of hedonic damages is called the "willingness to pay" theory. Johnson testified that he relied on particular studies written *63 about and evaluated by other authors concerning two methods under the "willingness to pay theory." The first method, the "survey" method, asks people how much they are willing to spend to reduce the probability of death from 3 deaths per 20,000 to 1 death per 20,000. The second method, the "wage risk" method, examines the salary people in high fatality risk jobs receive and the amount of money people are willing to forego to work a lower fatality risk job. Johnson then extrapolated a total value of hedonic damages from the differentials in salary.[33] Using these two methods, Johnson determined that a low $2.5 million to an average of $8.7 million with no ceiling was the tangible value of a person's life.
Johnson's methodology for the valuation of hedonic damages assisted the jury to understand the amount of damages that would compensate James for the loss of his enjoyment of life. Johnson's valuation theories were matters within the scope of his specialized knowledge concerning the monetary value of intangibles. Moreover, the probative value of Johnson's testimony was not substantially outweighed by the danger of unfair prejudice. Therefore, the district court properly exercised its discretion in qualifying Johnson as an expert and permitting him to testify concerning hedonic damages. We observe that Sunrise had the ability to use traditional methods of disputing Johnson's testimony, such as presenting witnesses on its behalf to persuade the jury that Johnson's methods were inaccurate or unreliable. The jury was then free to determine whether Johnson's valuation theories were credible and to weigh his testimony accordingly.[34]
With respect to an award of hedonic damages, some jurisdictions permit an award of hedonic damages as a separate and distinct compensatory award, in addition to the three common compensatory damages of lost earnings, medical expenses and pain and suffering.[35] These jurisdictions believe that compensating a victim for hedonic loss in a separate award prevents inadequate awards to the victim[36] and facilitates judicial review.[37] Other jurisdictions permit the trier of fact to treat hedonic loss as a factor in determining general damage awards or pain and suffering awards.[38] These courts reason that, because of the intangible nature of hedonic loss, separating hedonic loss into a distinct category will produce duplicative damage awards or overcompensate the victim.[39]
For example, in Huff v. Tracy,[40] a California court determined that the injured plaintiff, who suffered severe lacerations to his tongue during an automobile accident that permanently impaired his sense of taste, was entitled to argue, as one factor for a pain and suffering award, that he should receive compensation of his loss of enjoyment of life. The court noted that California did not have a "rule restrict[ing] a plaintiff's attorney from arguing this element [of damages] to a *64 jury."[41] The court analogized the treatment of hedonic loss to the treatment of mental damages, another element of a pain and suffering award of damages.[42]
We agree with California and those jurisdictions permitting plaintiffs to seek compensation for hedonic loss as an element of the general award for pain and suffering. Like California, Nevada does not restrict a plaintiff's attorney from arguing hedonic damages. Moreover, by including hedonic losses as a component of pain and suffering, we perceive no problem of confusion or duplication of awards by the jury. Accordingly, we hold that hedonic damages may be included as an element of a pain and suffering award of damages.
Here, however, the district court permitted the jury to award hedonic damages as a separate and distinct damage award, rather than including hedonic loss as a component of the pain and suffering damages award. Although the district court erroneously permitted the jury to give Banks a separate award for hedonic damages, the error was not prejudicial because the jury could have easily added the value of the hedonic loss to the pain and suffering award. Therefore, the record does not reveal that the hedonic damages award was duplicative or excessive. Accordingly, the error was harmless.

Directed verdict motion
At the conclusion of the trial, Sunrise moved for a directed verdict. NRCP 50(a) states that a motion for a directed verdict shall be denied "[i]f the evidence is sufficient to sustain a verdict for the opponent." The district court may not judge the credibility of the witnesses or the weight of the evidence.[43] Further, "[i]f there is conflicting evidence on a material issue, or if reasonable persons could draw different inferences from the facts, the question is one of fact for the jury and not one of law for the court."[44] In ruling on a directed verdict motion, "the district court must view the evidence and all inferences therefrom in a light most favorable to the non-moving party."[45] We apply this same standard on appeal.[46]
To recover for medical malpractice based on negligent maintenance of equipment, Banks had to demonstrate that Sunrise's conduct departed from the accepted standard of medical practice, that Sunrise's conduct was both the actual and proximate cause of James's injury and that James suffered damages.[47] The adverse inference instruction, discussed above, permitted the jury to infer that, had Sunrise preserved the equipment, it would have been found in a defective condition. The uncontroverted evidence at trial demonstrated that the anesthesia equipment was not preserved. Banks also introduced expert physician testimony demonstrating that the failure of the Narkomed II would have caused James's injury. Therefore, the jury could have reasonably determined that Sunrise's conduct departed from the accepted standard of care and that Sunrise's failure to maintain equipment actually and proximately caused James's injury. Conflicting evidence existed as to whether the equipment's malfunctioning caused James's injury. Viewing the evidence and the inferences therefrom in the light most favorable to Banks, we conclude that the district court properly denied Sunrise's motion for a directed verdict.
Similarly, because conflicting evidence existed as to whether James's brain injury was proximately related to his rotator cuff surgery, the res ipsa loquitur issue was one for the jury, not the court. Accordingly, viewing the evidence in a light most favorable to Banks, we conclude that the district court properly denied Sunrise's motion for a directed verdict.

*65 New trial

We review a district court's denial of a new trial motion for an abuse of discretion.[48] Sunrise contends that the jury manifestly disregarded numerous jury instructions, warranting a new trial under NRCP 59(a)(5).[49] Sunrise argues that the jury disregarded instructions (1) stating that the plaintiff must prove by a preponderance of the evidence that the defendant was negligent and that the negligence was the proximate cause of the plaintiff's injuries; (2) defining proximate cause; (3) defining preponderance of evidence; (4) stating that the plaintiff had the burden of establishing all the facts necessary to prove negligence and causation, except as stated in the res ipsa loquitur instruction and the adverse inference instruction; (5) setting forth the hospital's duty to use reasonable care to maintain equipment; and (6) stating that "[t]he fact that a particular injury suffered by a patient as a result of an operation is something that rarely occurs does not in itself prove that the injury was probably caused by negligence."[50]
Because the evidence does not support Sunrise's allegation that the jury disregarded the above jury instructions, we conclude that Sunrise's argument is without merit. For instance, the jury could have reasonably found that Sunrise was negligent in its duty to maintain equipment based on evidence that the equipment was fifteen years old; that while Sunrise had regularly scheduled maintenance checks, the checks may have been insufficient; that because the equipment was not available for inspection, experts were unable to testify to a reasonable degree of certainty that the equipment was functioning properly; and that no one in the operating room had heard alarms which should have sounded once James's blood pressure dropped. The jury also may have concluded that, despite Sunrise's testimony that Dr. Kinsman's negligence was the sole proximate cause of James's cardiac arrest, Banks's witnesses' testimony that the malfunctioning equipment would have affected James's ventilation was more persuasive. Finally, although Sunrise presented physician testimony that cardiac arrests and vasovagal events could occur during outpatient surgery, the jury could reasonably have found that Banks's expert's testimony, that such events did not usually occur during outpatient surgery in the absence of negligence, was more persuasive.
Sunrise also contends that it was deprived of a fair trial[51] as a result of the district court's decision to instruct the jury with Jury Instruction Nos. 22, 27, 28[52] and 32. Additionally, Sunrise claims that these instructions should not have been given to the jury as they were not supported by the evidence. Finally, Sunrise claims these instructions misstate the law.[53]
Jury Instruction No. 22 read:
There may be more than one proximate cause of an injury. When negligent conduct of two or more persons contributes concurrently as proximate causes of an injury, the conduct of each of said persons is a proximate cause of the injury regardless of the extent to which each contributes to the injury. A cause is concurrent if it was operative at the moment of injury and acted with another cause to produce the injury. It is no defense that the negligent conduct of a person not joined as a party was also a proximate cause of the injury.
*66 This instruction is substantively identical to Nevada Pattern Civil Jury Instruction (Nev.Civ. J.I.) No. 405, which is an adaptation of California Civil Jury Instruction (BAJI) No. 3.77. The comment to BAJI 3.77 states that a trial court should give this instruction whenever the issue of negligence of two or more defendants or contributory negligence is submitted to the jury.[54] In the instant case, the parties presented conflicting testimony over the cause of James's injury: Banks argued that the malfunctioning equipment caused James's injury, and Sunrise attempted to direct the blame at Dr. Kinsman. The district court explained that this instruction was a standard instruction included in every negligence case. The instruction cautioned jurors that, even if Sunrise was not the sole cause of the injury, but a contributing cause, the jury could still find Sunrise liable. The instruction is also consistent with our previous holding that "[w]here two or more causes proximately contribute to the injuries complained of, recovery may be had against either one or both of the joint tort-feasors."[55]
Jury Instruction No. 32 instructed the jury that there is no definite method of calculating compensation for pain and suffering. Sunrise argues that instructing the jury that damages for pain and suffering were recoverable is an error of law because such an award requires that the injured person be conscious of the pain. We have held that, in order to award damages for pain and suffering, a jury must find substantial evidence that the damages are probable.[56] In the instant case, jurors had the ability to view a video of James throughout the course of his day. Additionally, at trial, Charles Braden, James's nurse, testified that James was able to respond to his environment. Braden, through his five years of assisting James, stated that James would occasionally smile during a comedy show on television or when his family visited and had tears at times based on news and various exchanges with family members. Although Sunrise's physician expert testified that persons with hypoxic brain injury are unable to react to their environment, the expert based his testimony on his observations of the video. The expert never personally met with James. Accordingly, the jury was free to weigh the credibility of the witnesses on whether James was conscious of his pain and suffering. The above jury instruction simply instructed the jury that it would be responsible for calculating the damages. Accordingly, Sunrise's argument that a new trial is warranted is without merit.

Reduction of the jury award

Unclean hands
Banks contends that, because the right of offset is an equitable remedy and because Sunrise has unclean hands, Sunrise is not entitled to a reduction of the jury award. Banks relies on this court's decision in Evans v. Dean Witter Reynolds, Inc.,[57] for the proposition that the district court should not reduce a judgment against an intentional tortfeasor by a settlement from a joint tortfeasor. In Evans, the tortfeasors, a stockbroker and stock brokerage firm, intentionally converted a client's securities. We concluded that the intent behind "the Nevada `contribution' statutes prohibits one intentional tortfeasor from taking advantage of restitution made by another."[58]
The instant case is unlike Evans. While Sunrise acted improperly in its failure to preserve the anesthesia equipment, Sunrise was not an intentional tortfeasor because its acts were not intended or designed to cause harm to James. Accordingly, this argument is without merit.

Reference to Dr. Robert Kinsman's negligence
Banks contends that Sunrise was not entitled to an offset for the sum paid in settlement of his claim against Dr. Kinsman *67 because the jury heard evidence of Dr. Kinsman's negligence and, therefore, properly accounted for it in its judgment.
NRS 17.245(1)(a) allows a plaintiff to settle with one tortfeasor without losing the right to proceed against additional tortfeasors. However, to prevent double recovery to the plaintiff, the statute also provides that claims against nonsettling tortfeasors must be reduced by the amount of any settlement with settling tortfeasors. Moreover, while a plaintiff may proceed against an additional tortfeasor, in order to prevent improper speculation by the jury, the parties may not inform the jury as to either the existence of a settlement or the sum paid.[59]
Here, Sunrise did not elicit testimony or expose the jury to the fact that Dr. Kinsman had entered into settlements with Banks, nor did it mention the sum paid. NRS 17.245 does not prevent a defendant from pointing the blame at another defendant or from arguing that it was not responsible for the plaintiff's injury. Therefore, Sunrise was free to argue that Dr. Kinsman's negligence proximately caused James's injury, rather than the equipment malfunction. This line of argument did not compromise Sunrise's rights to an equitable setoff under NRS 17.245.
We likewise reject Banks's contentions that the jury reduced the verdict based upon alleged violations of NRS 41.141(3), which states that if a codefendant settles with the plaintiff in a case in which the remaining defendant asserts a comparative negligence defense, the jury may not consider the codefendant's comparative negligence or the settlement amount.[60] We conclude that NRS 41.141(3) has no bearing on the issues of whether Sunrise could argue a nonparty's fault in this instance and whether such an argument per force leads to the conclusion that the jury reduced the award based upon the nonparty's relative culpability. First, NRS 41.141 only prevents admission of evidence in support of a "comparative fault" or apportionment analysis of the case as to nonparties, and a jury may only "compare" the negligence as between parties and nonparties.[61] Nothing in NRS 41.141 prohibits a party defendant from attempting to establish that either no negligence occurred or that the entire responsibility for a plaintiff's injuries rests with nonparties, including those who have separately settled their liabilities with the plaintiff. Second, the fact that Sunrise pleaded comparative negligence as an affirmative defense is not pertinent to whether Sunrise could argue its defense theory of third-party culpability. Third, the defense was abandoned.[62] Fourth, neither *68 party submitted a comparative negligence instruction nor requested special verdict forms delineating the comparative negligence of Sunrise and Dr. Kinsman. In light of the above, there is no indication that the jury accounted for Dr. Kinsman's negligence in its award of damages. Accordingly, we conclude that this argument is without merit.

No finding of liability
Banks also contends that the district court improperly reduced the jury award by the sum paid in settlement on his claim against Dr. Manning because the arbitrator did not find Dr. Manning negligent. Banks relies on an Ohio appellate decision for the proposition that the defendant must demonstrate that his former codefendants were at least partially responsible for tort damages before he is entitled to an offset.[63]
The controlling law in Nevada, however, is NRS 17.245(1)(a), which provides:
1. When a release or a covenant not to sue or not to enforce judgment is given in good faith to one of two or more persons liable in tort for the same injury or the same wrongful death:
(a) It does not discharge any of the other tortfeasors from liability for the injury or wrongful death unless its terms so provide, but it reduces the claim against the others to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, whichever is the greater.
Statutory interpretation is a question of law and is reviewed de novo.[64] When interpreting a statute, we give words their plain meaning unless attributing the plain meaning would violate the spirit of the statute.[65] If more than one reasonable meaning can be discerned from the statute's language, it is ambiguous, and the plain meaning rule does not apply.[66] Instead, we look to the statute's terms and context, along with reason and public policy to ascertain the legislature's intent.[67] When interpreting a portion of a statute, we read the statute as a whole and give meaning to all of its parts where possible.[68] Finally, statutory interpretation should avoid absurd results.[69]
Here, the statute is couched in terms of a release or covenant not to sue, i.e., a settlement before a verdict is reached. Although the statute states "persons liable," requiring a final judgment of liability would create absurd results when read in context with the prejudgment language. The express language of the statute contemplates that the defendant and plaintiff have worked out a settlement prior to a final judgment of liability. Therefore, the plain meaning of the statute does not require that a party be found liable. Here, Banks and Dr. Manning opted to settle the matter through an arbitration agreement that included a minimum $100,000 award to Banks if the arbitrator found in favor of Dr. Manning and a maximum $1,000,000 if the arbitrator found Dr. Manning liable. Because the arbitrator determined that Dr. Manning's conduct did not fall below the standard of care, the arbitrator awarded Banks $100,000 as agreed. The parties entered into the agreement in good faith, and the agreement addressed the same injury for which the jury found Sunrise liable. Thus, the district court properly reduced the jury award by the settlement amount from Dr. Manning and Banks's argument is without merit.

*69 Potential wrongful death claimants

Banks contends that the Kinsman and Manning settlements were given, at least in part, in exchange for the release of potential wrongful death claims by prospective heirs. Banks asserts that reducing the jury award by the settlement amounts pertaining to wrongful death claims does not promote the policy against double recovery.
Sunrise responds that the statute of limitations for a wrongful death action had run by the time the parties settled in October 1999. NRS 41A.097(1) states that "an action for injury or death against a provider of health care may not be commenced more than 4 years after the date of injury." Sunrise contends that, because James was injured in August 1995, the wrongful death action was time barred after August 1999. However, we have previously held that "injury" in NRS 41A.097 pertains to legal injury.[70] Because death is an essential element of a wrongful death claim, the legal injury here is death. Because the record reveals that James was alive at the time of this appeal, Sunrise's argument is without merit.
We have previously held that a wrongful death claim pertains to the injury suffered by the heirs rather than by the decedent.[71] A California appellate court held that, where a judgment did not include damages for wrongful death claimants, the settlement amounts to the potential wrongful death claimants could not be used to offset the judgment against the nonsettling defendant.[72] Here, the jury's award did not include damages for the potential wrongful death claimants. Nor does the record reveal that the jury considered these claims. Although the record indicates that the potential wrongful death claimants were signatories on the settlement agreements, the record is devoid of any evidence indicating that the potential wrongful death claimants benefited from, were entitled to or received any portion of the settlement amount. It appears that the entire settlement amount went to Banks. Therefore, Banks would have received double recovery if the district court had failed to reduce the jury award by the settlement amounts.

CONCLUSION
We conclude that Sunrise has failed to demonstrate error that would entitle it to a reversal or a new trial. We also conclude that Banks has failed to demonstrate that the reduction of the jury award was improper. Accordingly, we affirm the judgment and order of the district court.
SHEARING C.J., ROSE, GIBBONS and DOUGLAS, JJ., concur.
MAUPIN, J., with whom BECKER, J., agrees, concurring in part and dissenting in part.
The majority opinion today addresses a myriad of undecided issues concerning tort litigation in Nevada. These include duties of a potential defendant to preserve evidence, the scope of expert testimony concerning preservation issues, the scope of the doctrine of res ipsa loquitur, whether Nevada recognizes the concept of hedonic damages, whether expert testimony is admissible in aid of a claim for hedonic damages, and the extent to which defendants in different scenarios are entitled to equitable offsets for pretrial settlements. I agree that expert evidence is admissible on questions of evidence spoliation, that general damage awards may include hedonic damages for conscious loss of enjoyment of life, that expert testimony may assist the fact-finder in resolving hedonic damage claims, and that defendants are entitled to equitable offsets in negligence actions regardless of whether the settlement monies are paid pursuant to an arbitration agreement and regardless of whether a defendant at trial argues that the settling defendant was at fault. I conclude, however, that the district court erred in its sanction instruction concerning preservation of evidence and in its application of the doctrine of res ipsa loquitur. In my view, these two errors require *70 reversal and remand to the district court for retrial.

DISCUSSION
In light of Sunrise's failure to preserve either the Narkomed II anesthesia machine or records that would enable Mr. Banks's attorneys to trace the machine for testing, the district court gave the following instruction:
Sunrise Hospital had a duty to identify all of the anesthesia equipment and monitors which were used in the Banks surgery. Defendant Sunrise failed in this duty and because of its failure, no independent review or inspection of the equipment could ever be done. You may infer that had the equipment been preserved and tested that it would have been found to be not operating properly.
In this instruction, the district court applied an absolute pre-litigation duty upon a potential defendant to preserve evidence. This action unfairly and retrospectively imposed a duty to preserve evidence at a time many months before the plaintiff first generated even so much as a remote reference to the evidence and years before the plaintiff took formal action against the defendant in connection with it. Additionally, the instruction found as a matter of law that the duty had been breached.
The case authority which the majority relies upon imposes sanctions for destruction or loss of evidence where a potential plaintiff discarded critical evidence prior to filing suit and then proceeded with the action.[1] Because a potential plaintiff has absolute control over whether to file a lawsuit and which theories of recovery he or she chooses to allege, it is perfectly appropriate to impose a duty to preserve evidence and impose sanctions in connection with its loss or destruction. However, a broad duty to preserve becomes problematic when applied to a potential defendant who may either never be sued or be sued upon a particular theory.
In a perfect world, a hospital or physician should investigate all possible reasons for a catastrophic surgical result, and any person involved in a catastrophic event would be wise to undertake some sort of investigation and preserve evidence to guard against the possibility of impending litigation. But the majority applies a wide ranging preservation duty under a very discrete set of circumstances. In my view, we should not impose a presuit duty upon a defendant unless there is evidence that supports an inference that the destruction was calculated to gain a competitive advantage in the event of litigation.[2] Here, Banks never claimed that Sunrise willfully destroyed evidence to avoid exposure to this case, and the claim that the machine was implicated in Mr. Bank's profound neurological damage did not surface until well after the machine was turned over to a purchaser under an agreement that predated the surgery.
Having said this, the jury should have been allowed to hear evidence concerning the possibilities if testing had been available and been instructed on permissible inferences from the loss of the machine. However, the district court should not have instructed the jury that an absolute duty existed to preserve evidence and that Sunrise breached this duty, particularly when there was no indication that the machine was implicated until Mr. Banks filed his initial complaint some seven months after the disposal of the machine, the original complaint only referred to the machine in connection with allegations against fictitiously named defendants, the anesthesiologist renounced any difficulty with the machine, the defendant disposed of the equipment pursuant to an agreement that predated the surgery, and Mr. Banks failed to allege any claims against Sunrise concerning *71 the machine until some four years after the fact.
The majority imposes a duty to preserve evidence, which a potential defendant knows or should know may be relevant to an unfiled action. This standard, in its broad application, forces potential parties to anticipate or speculate as to the mere prospect of a particular type of suit, and likewise imposes sanctions for a failure to do so. While this case is marked by a compelling and tragic set of circumstances, this is not the way to provide a just adjudication of Mr. Banks's claims against the hospital.

Res ipsa loquitur
In my view, this is also not a res ipsa loquitur case. NRS 41A.100 requires that medical malpractice claims be supported by expert opinion testimony. Such evidence, however, is unnecessary when the claimant offers some evidence of one or more of the circumstances enumerated in NRS 41A.100(1)(a) through (e), which embody former res ipsa loquitur principles. The majority concludes that the district court properly instructed the jury under NRS 41A.100(1)(d). Paragraph (d) forgives the expert testimony requirement when the injury occurs "during the course of treatment to a part of the body not directly involved in the treatment or proximate thereto." The majority embraces this provision, reasoning that Mr. Banks's brain was not proximately or directly related to his rotator cuff surgery. I respectfully disagree.
To explain, the damage claim in this case was based upon profound and irreversible brain injury secondary to complications of general anesthesia. The use of general anesthesia, i.e., the sedation of the central nervous system, was part and parcel of the surgical treatment of the patient. Because sedation of the central nervous system constitutes treatment directly involving the brain, NRS 41A.100(1)(d) is not implicated.

CONCLUSION
In my view, the district court erred in the construct of its spoliation instruction and in its res ipsa loquitur instructions under NRS 41A.100(1)(d). Accordingly, while I agree with the majority in all other respects, I would reverse and remand this matter for retrial.
BECKER, J., concurs.
NOTES
[1] Even though Sunrise states that it also appeals from the district court's order denying its motion for judgment notwithstanding the verdict, an appeal does not lie from a district court order that denies a post-judgment motion for judgment notwithstanding the verdict. See Dow Chemical Co. v. Mahlum, 114 Nev. 1468, 1475 n. 1, 970 P.2d 98, 103 n. 1 (1998), modified on other grounds by GES, Inc. v. Corbitt, 117 Nev. 265, 271, 21 P.3d 11, 14-15 (2001).
[2] A work-related injury necessitated James's surgery, which was being covered by his workers' compensation carrier. Several companies responsible for payment of the workers' compensation claim filed a complaint in intervention. Before the second trial commenced, the plaintiffs in intervention dismissed their claims against Sunrise.
[3] This included $1.8 million from the settlement with Dr. Kinsman and $100,000 from the arbitration agreement with Dr. Manning.
[4] Pursuant to NRAP 28(h), Banks is deemed the appellant.
[5] GNLV Corp. v. Service Control Corp., 111 Nev. 866, 869, 900 P.2d 323, 325 (1995).
[6] Id. (quoting Fire Ins. Exchange v. Zenith Radio Corp., 103 Nev. 648, 651, 747 P.2d 911, 914 (1987)).
[7] Johnson v. Egtedar, 112 Nev. 428, 432, 915 P.2d 271, 273 (1996).
[8] Ringle v. Bruton, 120 Nev. 82, 90, 86 P.3d 1032, 1037 (2004).
[9] Johnson, 112 Nev. at 433, 915 P.2d at 273-74.
[10] Id. at 433-34, 915 P.2d at 274.
[11] Id. at 434, 915 P.2d at 275.
[12] Id.
[13] 114 Nev. 854, 859, 962 P.2d 1227, 1231 (1998).
[14] Id. at 859, 962 P.2d at 1230-31.
[15] See Mercado v. Ahmed, 974 F.2d 863, 870 (7th Cir.1992).
[16] K-Mart Corporation v. Washington, 109 Nev. 1180, 1186, 866 P.2d 274, 278 (1993); NRS 48.035.
[17] Krause Inc. v. Little, 117 Nev. 929, 933-34, 34 P.3d 566, 569 (2001).
[18] Brown v. Capanna, 105 Nev. 665, 671-72, 782 P.2d 1299, 1304 (1989); see also Prabhu v. Levine, 112 Nev. 1538, 1544, 930 P.2d 103, 108 (1996); Fernandez v. Admirand, 108 Nev. 963, 972-73, 843 P.2d 354, 360 (1992).
[19] 109 Nev. 421, 424, 851 P.2d 423, 425 (1993).
[20] Id. at 424-25, 851 P.2d at 425.
[21] Id. at 425, 851 P.2d at 425 (stating that "[a] possibility is not the same as a probability").
[22] The American Heritage Dictionary 610 (1980).
[23] Boan v. Blackwell, 343 S.C. 498, 541 S.E.2d 242, 244 (2001) (citation omitted).
[24] Pierce v. New York Central Railroad Company, 409 F.2d 1392, 1399 (6th Cir.1969); see, e.g., McAlister v. Carl, 233 Md. 446, 197 A.2d 140, 143-46 (1964).
[25] Mercado, 974 F.2d at 871 (noting that expert testimony did not provide expert assistance to the jury); Kurncz v. Honda North America, Inc., 166 F.R.D. 386, 388-90 (W.D.Mich.1996) (noting that expert opinion testimony on hedonic damages is unreliable and unhelpful); Scharrel v. Wal-Mart Stores, Inc., 949 P.2d 89, 92 (Colo.Ct.App.1997) (noting that the expert's opinions on hedonic loss did not assist the jury).
[26] See Sherrod v. Berry, 629 F.Supp. 159, 164 (N.D.Ill.1985), rev'd on other grounds, 856 F.2d 802 (7th Cir.1988); Couch v. Astec Industries, Inc., 132 N.M. 631, 53 P.3d 398, 403 (App.2002); Lewis v. Alfa Laval Separation, Inc., 128 Ohio App.3d 200, 714 N.E.2d 426, 436 (1998).
[27] See Canterino v. The Mirage Casino-Hotel, 117 Nev. 19, 24, 16 P.3d 415, 418 (2001).
[28] Sherrod, 629 F.Supp. at 163-64; Couch, 53 P.3d at 403.
[29] Mahlum, 114 Nev. at 1482, 970 P.2d at 108.
[30] NRS 50.275.
[31] Sierra Pacific v. Anderson, 77 Nev. 68, 76, 358 P.2d 892, 896 (1961).
[32] See Mercado, 974 F.2d at 871; Kurncz, 166 F.R.D. at 388-91; Lewis, 714 N.E.2d at 434-35; see also Stephen T. Riley, The Economics of Hedonic Damages, Nevada Lawyer, Aug. 1993, at 25-28.
[33] See Hein v. Merck & Co., Inc., 868 F.Supp. 230, 233-34 (M.D.Tenn.1994).
[34] Krause, 117 Nev. at 933, 34 P.3d at 569.
[35] See Thompson v. National R.R. Passenger Corp., 621 F.2d 814, 824-25 (6th Cir.1980); Fantozzi v. Sandusky Cement Products Co., 64 Ohio St.3d 601, 597 N.E.2d 474, 486-87 (1992).
[36] Boan, 541 S.E.2d at 245 (noting that permitting hedonic damages as a separate damages award minimizes the risk of under- or overcompensating the victim by the jury).
[37] Pierce, 409 F.2d at 1399; Fantozzi, 597 N.E.2d at 486; see also Thompson, 621 F.2d at 824 (recognizing that a "pain and suffering [award] compensates the victim for the physical and mental discomfort caused by the injury," whereas a hedonic damage award "compensates the victim for the limitations on the person's life created by the injury").
[38] See Loth v. Truck-A-Way Corp., 60 Cal.App.4th 757, 70 Cal.Rptr.2d 571, 575 (1998); Poyzer v. McGraw, 360 N.W.2d 748, 753 (Iowa 1985); First Trust Co. v. Scheels Hardware, 429 N.W.2d 5, 13-14 (N.D.1988); Missouri Pac. R. Co. v. Lane, 720 S.W.2d 830, 834 (Tex.App.1986); Judd v. Rowley's Cherry Hill Orchards, Inc., 611 P.2d 1216, 1221 (Utah 1980); Flannery v. United States, 171 W.Va. 27, 297 S.E.2d 433, 438 (1982).
[39] Poyzer, 360 N.W.2d at 753; Flannery, 297 S.E.2d at 438.
[40] 57 Cal.App.3d 939, 129 Cal.Rptr. 551, 553 (1976).
[41] Id.
[42] Id.
[43] See Broussard v. Hill, 100 Nev. 325, 327, 682 P.2d 1376, 1377 (1984).
[44] Id.
[45] Chowdhry v. NLVH, Inc., 109 Nev. 478, 482, 851 P.2d 459, 462 (1993).
[46] Id.
[47] See Prabhu, 112 Nev. at 1543, 930 P.2d at 107.
[48] Id.
[49] NRCP 59(a)(5) provides that the district court may grant a new trial if "[m]anifest disregard by the jury of the instructions of the court" materially affected a party's substantial rights.
[50] Sunrise also takes issue with the res ipsa loquitur instruction. However, as discussed above, substantial evidence supported the jury's verdict as to the res ipsa loquitur issue.
[51] NRCP 59(a)(1) provides for a new trial upon a showing of "[i]rregularity in the proceedings of the court, jury, master, or adverse party, or any order of the court, or master, or abuse of discretion by which either party was prevented from having a fair trial."
[52] We concluded above that the district court properly submitted Jury Instruction No. 27, the res ipsa loquitur instruction, and Jury Instruction No. 28, the adverse inference instruction.
[53] NRCP 59(a)(7) provides for a new trial upon a showing of "[e]rror in law occurring at the trial and objected to by the party making the motion."
[54] BAJI 3.77 (9th ed. West 2002).
[55] Mahan v. Hafen, 76 Nev. 220, 225, 351 P.2d 617, 620 (1960).
[56] Sierra Pacific, 77 Nev. at 75, 358 P.2d at 896.
[57] 116 Nev. 598, 609-10, 5 P.3d 1043, 1050 (2000).
[58] Id. at 611, 5 P.3d at 1051.
[59] Moore v. Bannen, 106 Nev. 679, 680-81, 799 P.2d 564, 565 (1990).
[60] NRS 41.141 provides, in pertinent part:

1. In any action to recover damages for death or injury to persons or for injury to property in which comparative negligence is asserted as a defense, the comparative negligence of the plaintiff or his decedent does not bar a recovery if that negligence was not greater than the negligence or gross negligence of the parties to the action against whom recovery is sought.
2. In those cases, the judge shall instruct the jury that:
(a) The plaintiff may not recover if his comparative negligence or that of his decedent is greater than the negligence of the defendant or the combined negligence of multiple defendants.
(b) If the jury determines the plaintiff is entitled to recover, it shall return:
(1) By general verdict the total amount of damages the plaintiff would be entitled to recover without regard to his comparative negligence; and
(2) A special verdict indicating the percentage of negligence attributable to each party remaining in the action.
3. If a defendant in such an action settles with the plaintiff before the entry of judgment, the comparative negligence of that defendant and the amount of the settlement must not thereafter be admitted into evidence nor considered by the jury. The judge shall deduct the amount of the settlement from the net sum otherwise recoverable by the plaintiff pursuant to the general and special verdicts.
[61] See Warmbrodt v. Blanchard, 100 Nev. 703, 709, 692 P.2d 1282, 1286 (1984) (holding that district court erred in instructing the jury to consider and apportion negligence of nonparties to the trial via special verdict).
[62] Mere assertion of comparative negligence as an affirmative defense does not, in any case, implicate the operation of NRS 41.141. See Buck v. Greyhound Lines, 105 Nev. 756, 763-64, 783 P.2d 437, 442 (1989); see also Carlton v. Manuel, 64 Nev. 570, 576, 187 P.2d 558, 561 (1947) (noting that, although the appellant raised an affirmative defense, where the record did not disclose any formal offer of proof regarding the affirmative defense, the affirmative defense was abandoned).
[63] In re Miamisburg Train Derailment, 132 Ohio App.3d 571, 725 N.E.2d 738, 747 (1999).
[64] Barrick Goldstrike Mine v. Peterson, 116 Nev. 541, 545, 2 P.3d 850, 852 (2000).
[65] McKay v. Bd. of Supervisors, 102 Nev. 644, 648, 730 P.2d 438, 441 (1986).
[66] Id. at 649, 730 P.2d at 442.
[67] Id. at 649-51, 730 P.2d at 442-43.
[68] Building & Constr. Trades v. Public Works, 108 Nev. 605, 610, 836 P.2d 633, 636 (1992).
[69] General Motors v. Jackson, 111 Nev. 1026, 1029, 900 P.2d 345, 348 (1995).
[70] Fernandez v. Kozar, 107 Nev. 446, 449, 814 P.2d 68, 70 (1991).
[71] Id.
[72] Wilson v. John Crane, Inc., 81 Cal.App.4th 847, 97 Cal.Rptr.2d 240, 250 (2000).
[1] See Fire Ins. Exchange v. Zenith Radio Corp., 103 Nev. 648, 651, 747 P.2d 911, 914 (1987). Although Fire Ins. Exchange embraced a general duty to preserve relevant evidence that would apply to any party on notice of litigation, the decision did not flush out public policy considerations concerning when a defendant has such a duty.
[2] See Stubli v. Big D International Trucks, 107 Nev. 309, 810 P.2d 785 (1991) (Rose, J., dissenting) (concluding that loss of evidence was not entirely willful and that sanction of dismissal was too harsh).